UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BRIAN WOODRING, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:14-cv-00165-JMS-DML |
| | ) |
| DAVID LIEBEL, ROBERT BUGHER, | ) |
| WENDY KNIGHT, DAVID SMITH, and | ) |
| JACK HENDRIX | ) |
| | ) |
| Defendants. | ) |

**Entry Discussing Defendants' Motion for Summary Judgment**

Plaintiff Brian Woodring alleges that defendants David Liebel, Robert Bugher, and David Smith are liable to him because they retaliated against him in violation of his First Amendment rights.[1] Specifically, Mr. Woodring alleges that these defendants either initiated or failed to stop his transfer from Correctional Industrial Facility ("CIF") to Pendleton Correctional Facility ("Pendleton") in retaliation for his participation in a 2011 contempt action. The defendants seek summary judgment on the claims alleged against them. They argue that they are entitled to summary judgment because Mr. Woodring was transferred so that he could receive certain Jewish services and not for an improper purpose.

---

[1] Woodring filed a surreply brief in which he requests that the Court dismiss Superintendent Knight and Jack Hendrix as defendants. This request is **granted**. The claims against Superintendent Knight and Mr. Hendrix are dismissed. The **clerk is directed** to terminate these defendants on the docket.

1

For the reasons explained below, the defendants' motion for summary judgment [dkt. 90] is **granted in part and denied in part.** The motion is granted as to defendants Robert Bugher and Chaplain David Smith. These defendants are entitled to judgment as a matter of law. The motion is denied as to defendant David Liebel because there are material facts in dispute regarding whether he retaliated against Mr. Woodring for exercising his First Amendment rights.

## I. Standard of Review

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." *Fed. R. Civ. P.* 56(a). When evaluating this inquiry, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial ... against the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986); *see also Ault v. Speicher*, 634 F.3d 942, 945 (7th Cir. 2011). The key inquiry, is whether admissible evidence exists to support a plaintiff's claims, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections,* 175 F.3d 497, 504 (7th Cir. 1999). Judgment as a matter of law cannot be granted on an issue that turns on witness credibility. *See Burger v. Int'l Union of Elevator Constructors Local No. 2*, 498 F.3d 750, 753 (7th Cir. 2007).

## II. Factual Background

The following factual background is evaluated pursuant to the standards set forth above. That is, this statement of facts is not necessarily true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most

favorable to Mr. Woodring as the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

Mr. Woodring identifies himself as Jewish.

Mr. Woodring requested and was denied a kosher diet at CIF. This Court previously held in *Maston Willis v. Commissioner, IDOC*, 1:09-cv-815 JMS-DML (dkt. 103), that the Indiana Department of Correction's ("DOC") termination of kosher diets violated the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1(a). The *Willis* litigation was brought on behalf of a class of individuals who self-identified as requiring a kosher diet to properly exercise their religious beliefs. On December 22, 2011, class counsel filed a motion to intervene for the purpose of seeking contempt remedies on behalf of Mr. Woodring and three other members of the class in *Willis.* (See docket number 146). That motion was voluntarily dismissed on March 12, 2012, for procedural reasons. In September 2012, the parties reached an agreement in principle to resolve the issues related to the motion to intervene. Out of this agreement a new procedure concerning the provision of kosher diets was created. At some point in February or March of 2013, Mr. Woodring began receiving his kosher diet.

On January 19, 2012, Defendant David Liebel, then Deputy Director of Religious and Volunteer Services, drafted an email in which he reported being approached by Mr. Woodring (one of the four offenders involved in the *Willis* contempt case) while at CIF. The email stated that Mr. Woodring asked why there weren't Jewish services at CIF and whether it is true that anyone who asked for them would be transferred. In response, Mr. Liebel stated that it is a combination of a lack of volunteers and a lack of demand from CIF and that if an inmate wanted to participate in Jewish services, the quickest and easiest way would be to write Dr. Hall, the Director of

3

Religious and Volunteer Services, to request a move for religious purposes. Dkt. 108-7 at p. 21. Mr. Woodring testified that he did not demand services be provided at CIF and that he "advised Liebel I did not want to be transferred." Dkt. 108-1 at p. 14.

In September 2012, Mr. Woodring's mother was diagnosed with terminal cancer.

On September 26, 2012, Mr. Woodring requested an enhanced kosher fasting sack to break his fast surrounding the Jewish High Holy day of Yom Kippur. Mr. Woodring only received a sack dinner that was not kosher. Unhappy, Mr. Woodring filed a grievance complaining of mistreatment and discrimination against him and Jewish prisoners in general by Chaplain Smith. He wrote:

> This facility has a history (the chapel and chaplains that is) of discriminating against Jews and this is yet another example of such. The chaplains refuse services for Jews/Hebrews/Israelites and inmates who choose 'other' for religious preferences. We are not supplied Jewish Literature, Jewish Kippahs, Jewish Calendars of Holidays, nothing.

Dkt. 108-6 at p. 20. Mr. Woodring requested a meeting with the grievance specialist, Chaplain Smith and all Jewish inmates at the facility to address these concerns. As a result of this grievance, a meeting was reportedly scheduled for October 27, 2012. Dkt. 108-2 at p. 31-32 (grievance response).

On October 19, 2012, Chaplain David Smith emailed David Liebel asking for help. Chaplain Smith stated that he had responded to a grievance from Mr. Woodring about the lack of corporate Jewish services at CIF and had also found a flyer in a housing unit soliciting requests for Jewish services. In response, Mr. Liebel recalled his earlier (January 19, 2012) conversation with Mr. Woodring and suggested initiating a lateral transfer so that Mr. Woodring could receive Jewish services at another facility.

4

That same day, Mr. Liebel emailed legal counsel (not including defendant Mr. Bugher) stating that unless they had an objection he would like to initiate a lateral move for Mr. Woodring. Dkt. 108-7 at p. 28.

On October 23, 2012, counsel for the DOC[2] contacted counsel for the plaintiff class in *Willis* to ask if there were any legal impediments or consequences to transferring Mr. Woodring.

> Ken –
>
> Brian Woodring, DOC # 110925, one of the four named in the Willis contempt petition, is advocating for Jewish services at CIF, which are not currently offered and which no one else there has asked for. So the Department is contemplating sending him to Pendleton, Miami or the Prison, all of which have active Jewish services. He is a level 3, as are those facilities. I advised that I don't see any relationship between the contempt proceedings in Willis and moving an offender so he can have a service he wants. The move is DOC's idea and not his and he hasn't been informed yet. Do you see any legal obstacle?

Dkt. 108-7 at p. 23.

On October 27, 2012, Mr. Woodring (consistent with the grievance response he received) reported to the chapel expecting to participate in a meeting with Chaplain Smith and others to discuss his religious practices. However, Chaplain Smith refused to allow Mr. Woodring to participate in the meeting with other Jewish offenders. Mr. Woodring grieved this incident. He stated that the Chaplain had lied to him. Mr. Woodring demanded that a meeting be held at CIF with all the Jewish inmates to address "ALL the issues we are having regarding Judaism and its practice." Dkt. 108-7 at p. 38.[3] In response, Mr. Woodring was told that the meeting was canceled because Mr. Liebel was unavailable to participate that day and that another meeting would be arranged. Dkt. 108-8 at p. 3 and dkt. 108-7 at p. 40. Chaplain Smith explained that because there

---

[2] This is the same counsel who is representing the defendants in this civil action.

[3] Mr. Woodring testified that "[a]t no time while at CIF did I ever orally advise any staff member that I wanted Jewish services or otherwise request Jewish services," but this testimony is directly contradicted by the statements made in his grievances.

5

is no outside spiritual advisor for Jewish offenders, Mr. Liebel's presence was requested so that he could give advice regarding outside spiritual support that could help Mr. Woodring. *Id.*

Dr. Stephen Hall, Director of Religious and Volunteer Services, wrote to Jack Hendrix, Executive Director of Classification, on November 9, 2012, that Offender Michael Ludy, a Hebrew Israelite, and Mr. Woodring "have been advocating and recruiting for Jewish services for the past several months. Each brings his own particular issues that make us believe that the best interests of the department will be served by relocating them to facilities which already have the appropriate services." Dr. Hall reported "we do not have appropriate staff or volunteers" for Jewish services at CIF. Dkt. 108-7 at p. 25.

On November 19, 2012, Mr. Liebel emailed Jack Hendrix (Executive Director of Classification), Mr. Bugher and Dr. Hall recommending Pendleton as the receiving facility to accommodate issues about Mr. Woodring's mother's health and visitation. Mr. Liebel stated:

> My view is that we can meet Mr. Woodring's desire to have corporate Jewish services by moving him to Pendleton Correctional Facility, and that this move will have no adverse impact on the ability of his parents to visit him. I don't trust his offer to stop pursuing Jewish services at CIF if we allow him to stay there. He could easily twist that later to "DOC made me abandon my sincerely held religious beliefs or they would ship me away from my dying mother."

Dkt. 108-8 at p. 6.

On November 28, 2012, Mr. Woodring's transfer from CIF to Pendleton was set in motion: "Recommend institutional transfer per central office request so offender may participate in designated religious services not offered at current facility" and signed by Jeri E. Thompson under Central Office Classification Division Action.

6

On November 30, 2012, Mr. Woodring was transferred from CIF to Pendleton. These two DOC facilities sit next door to each other. CIF had no congregate Jewish services but Pendleton did.

On Monday December 3, 2012, Mr. Liebel wrote an email to Andrew Cole (an Assistant Superintendent at Pendleton, dkt. 108-4 at p. 40) in which he states the following about Mr. Woodring:

- He was moved to meet his stated need of attending Jewish services.
- My experience is that he is smart, and manipulative.
- Strongly encourage that he not be given a job in the law library or that otherwise has computer access. See OCMS case note from 1/1/2009 at IYC. CIF made him a law clerk and regretted it.
- Recently, he learned that we were planning on moving him, and suddenly began a campaign to stay at CIF so that his terminally ill mother can visit. Amazingly, she actually is terminally ill. I've spoken with her oncologist's office, and verified that she is a patient. I've requested a brief statement from her doctor, but have not yet received one. Wendy Knight has confirmed that Mrs Woodring is increasingly frail and ill looking. Let's go ahead and consider this true. ISR has complete discretion in responding to any requests for extended visits or other accommodations. No "deals" or agreements were reached with Woodring.
- CIF had started the practice of allowing Woodring to make phone calls to his wife in China using pre-paid cards instead of the offender phone system. Not sure why, as the new system allows international calls. Again, this is an ISR decision as to whether to continue the practice.
- You will probably get some bluster about his having contacted Ken Falk, Rabbi Grossbaum and others to prevent his move. That's true, but they have also all given their consent to his move.

Dkt. 108-8 at p. 11.

### *Defendant Robert Bugher*

Mr. Bugher is Chief Counsel to the Department of Correction and was such in November 2012. As Chief Counsel, Mr. Bugher had knowledge of the legal proceedings associated with *Willis*. Mr. Liebel sought legal advice from Mr. Bugher regarding the possibility of transferring Mr. Woodring to a facility with existing Jewish services. Mr. Bugher was not "involved in the decision-making process" beyond providing legal advice.

7

*David Smith*

David Smith is a Chaplain at CIF and was such in November 2012. Chaplain Smith testified that he was not involved in the decision to transfer Mr. Woodring. Chaplain Smith believed that he did not have the authority to request, propose or otherwise set into motion a religious transfer for an inmate. Dkt. 108-1 at p. 23.

On November 28, 2012, Chaplain Smith "discussed transfer with Offender Woodring on C-Unit at his request, after he was informed by the Unit Case Manager [that he was being transferred]." Dkt. 108-1 at p. 22. Chaplain Smith was informed of Mr. Woodring's mother's cancer diagnosis and "was made aware of [the] kosher suit." Dkt. 108-2 at p. 20. According to Mr. Woodring, Chaplain Smith assured him that he would not be transferred and that everything was okay. Dkt. 108-2 at p. 20. Chaplain Smith's email to Superintendent Knight at 4:12 p.m. on November 28, 2012, reflects that Chaplain Smith was concerned about Mr. Woodring and believed that telling Mr. Woodring that he would be transferred to Pendleton and not to the Indiana State Prison in Michigan City, Indiana, would help him cope. Dkt. 108-8 at p. 9-10. This request was denied by the Superintendent for security reasons.

Mr. Woodring testified in his deposition that Chaplain Smith informed Mr. Woodring that he would be transferred because he filed in *Willis*. Dkt. 90-1 at p. 9. Mr. Woodring does not think that Chaplain Smith spoke to anyone about a potential transfer only that Chaplain Smith implied that it's policy. *Id.* at p. 11.[4] This testimony does not reflect that Chaplain Smith was responsible for setting the transfer in motion or that his approval was necessary before a transfer could occur.

---

[4] This is in contrast to Chaplain Smith's statement that prior to Mr. Woodring's transfer in November 2012 that he was not aware that Mr. Woodring requested that the ACLU of Indiana assist him in acquiring a kosher diet. Mr. Woodring's response brief lays out a host of

8

*David Liebel*

Mr. Liebel is currently Director of Religious and Volunteer Services, and was the Deputy Director in November 2012. In response to Plaintiff's Interrogatory No. 8, "Why was Mr. Woodring transferred from Correctional Industrial Facility?" Mr. Liebel responded: "Mr. Woodring had requested access to Jewish corporate services which were not available at CIF. He was transferred to Pendleton Correctional Facility which had existing Jewish services." Dkt. 90-3 at p. 25. Mr. Liebel was aware of Mr. Woodring's participation in *Willis*. Mr. Liebel was also aware that Mr. Woodring's mother had cancer and that Mr. Woodring did not want to be transferred because Mr. Woodring and his family believed it would create a hardship and limit the mother's ability to visit her son.

### III. Discussion

The defendants argue that they are entitled to judgment as a matter of law because they did not retaliate against Mr. Woodring.

To prevail on a First Amendment retaliation claim, Mr. Woodring "must ultimately show that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). "The burden then shifts to the defendants to show

---

inconsistencies related to statements made by Chaplain Smith. None of these inconsistencies, however, are material to the issue of retaliation. At most, the record reflects that Mr. Woodring wanted Chaplain Smith to provide him with resources to practice Judaism. The problem is that Chaplain Smith did not have the resources Mr. Woodring sought. As a result, Chaplain Smith reached out to Mr. Liebel for guidance. It was Mr. Liebel who ultimately started and encouraged the process of transferring Mr. Woodring.

that they would have taken the action despite the bad motive." *Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir. 2009); *see also Greene v. Doruff,* 660 F.3d 975 (2011) (discussing causation in First Amendment cases). Another way to think of these cases, is whether a price been attached to protected speech. *Herron v. Meyer*, 820 F.3d 860, 863 (7th Cir. 2016) ("If Meyer set out to punish Herron for his grievances, then a price has been attached to speech.").

There is no dispute that Mr. Woodring engaged in activity protected by the First Amendment. "'A prisoner has a First Amendment right to make grievances about conditions of confinement.'" *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012) (*quoting Watkins v. Kasper*, 599 F.3d 791, 798 (7th Cir. 2010)). What is in dispute is whether the transfer that followed would likely deter First Amendment activity in the future; whether the First Amendment activity was a motivating factor in the decision to transfer Mr. Woodring; and whether the defendants would have transferred Mr. Woodring despite any bad motive?

**1. Would the transfer likely deter First Amendment activity in the future?**

A transfer to less amenable and more restrictive quarters for non-punitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence. *Hewitt v. Helms*, 459 U.S. 460, 468 (1983). However, even if the transfer would not be actionable in and of itself, if the transfer was taken in retaliation for the exercise of a constitutionally protected right, then it is actionable under 42 U.S.C. § 1983. *See Howland v. Kilquist*, 833 F.2d 639, 644 (7th Cir. 1987) ("[A]n act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for different reasons, would have been proper."); *see also Higgason v. Farley,* 83 F.3d 807, 810 (7th Cir.1996) (per curiam) (retaliatory transfer of a

prisoner); *Babcock v. White*, 102 F.3d 267, 275 (7th Cir.1996) (retaliatory delay in transferring prisoner).

Whether Mr. Woodring's transfer from CIF to Pendleton was likely to deter First Amendment activity in the future is a material fact in dispute. Accepting Mr. Woodring's testimony as true (as we must for purposes of summary judgment) the transfer to Pendleton was against his wishes and subjected him to a variety of burdens and challenges (i.e., he lost his prison job, he could no longer call his wife in China, and his terminally ill mother was no longer able to visit as easily because of the length of visit permitted and the physical visitation space available). In other words, Mr. Woodring was injured by the transfer. *Bridges*, 557 F.3d at 555 (*citing Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) ("A tort to be actionable requires injury. It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise....")). Accordingly, Mr. Woodring has presented sufficient evidence to plausibly suggest that his transfer from CIF to Pendleton was likely to deter First Amendment activity in the future.

**2. Was the First Amendment activity a motivating factor in the decision to transfer Mr. Woodring?**

Retaliation requires a showing that the plaintiff's First Amendment activity was a motivating factor in the defendants' conduct. See *Watkins v. Kasper,* 599 F.3d 791, 794 (7th Cir.2010); *Bridges v. Gilbert,* 557 F.3d 541, 552 (7th Cir. 2009). The record reflects that Mr. Woodring's request for a kosher diet (through his participation in *Willis*) and statements made in his grievances, motivated Mr. Liebel's decision to request that Mr. Woodring be transferred. It is on this element, however, the claims against Chaplain Smith and Mr. Bugher must fail. As to both

11

Chaplain Smith and Mr. Bugher, the evidence reflects that they were not responsible for Mr. Woodring's transfer. In other words, they were not responsible for the retaliatory act.

First, as to Chaplain Smith, the record reflects that Mr. Woodring expected Chaplain Smith to provide services to support Mr. Woodring's practice of Judaism. Chaplain Smith's performance in this regard fell short of Mr. Woodring's expectations. Mr. Woodring noted in his grievance that no services for Jewish prisoners were provided. He specifically referenced Jewish Literature, Jewish Kippahs, and Jewish Calendars of Holidays. In response to Mr. Woodring's grievances, Chaplain Smith reached out to Mr. Liebel. Given the lack of resources for Jewish inmates at CIF, there was nothing improper about Chaplain Smith seeking help from Mr. Liebel to address Mr. Woodring's concerns. Besides seeking help, there is no evidence that Chaplain Smith took any steps to initiate or to effectuate Mr. Woodring's transfer. *See Springer v. Durflinger,* 518 F.3d 479, 484 (7th Cir. 2008) (speculation concerning retaliatory motives cannot create a genuine issue of material fact); *Borcky v. Maytag Corp.,* 248 F.3d 691, 695 (7th Cir. 2001); *Devbrow v. Gallegos*, 735 F.3d 584, 588 (7th Cir. 2013). Accordingly, Chaplain Smith lacked personal responsibility for the alleged retaliatory transfer and is entitled to judgment as a matter of law on this basis.

As to Mr. Bugher, the record reflects that his only role in the transfer is that he was contacted by Mr. Liebel to provide legal advice. This is not enough to subject him to liability. There is simply insufficient evidence upon which any reasonable trier of fact could conclude that Mr. Bugher was responsible for ordering the transfer of Mr. Woodring. To the contrary, the email correspondence reflects that it was Mr. Liebel who requested the transfer. Accordingly, Mr. Bugher lacked personal responsibility for the alleged retaliatory transfer and is entitled to judgment as a matter of law.

### 3. Would the defendant have transferred Mr. Woodring despite any bad motive?

Mr. Liebel argues that Mr. Woodring would have been transferred despite any bad motive. He explains that Mr. Woodring wanted additional services related to his practice of Judaism and that those services were not available at CIF necessitating the transfer. In addition, if there were retaliatory intent, Mr. Woodring would have been transferred to the Indiana State Prison in Michigan City, but he wasn't. That possible transfer was discussed and rejected specifically so that Mr. Woodring could have Jewish services available and still accommodate his mother's visitation needs. Given the current record, a reasonable trier of fact could conclude that Mr. Liebel sought to transfer Mr. Woodring to provide him the resources he requested and not for any improper motive.

On the other hand, a reasonable trier of fact could conclude that Mr. Liebel sought to transfer Mr. Woodring because of his First Amendment activities. This conclusion is based on the following facts. First, the timing of events. The protected activity happened before but close in time to the transfer. *See Sitar v. Indiana Dept. of Transportation*, 344 F.3d 720, 728 (7th Cir. 2003) (noting that one event's following closely upon another is not dispositive in proving that the first act caused the second). Specifically, the informal resolution of the contempt proceeding in *Willis* occurred in September 2012. Second, although Mr. Woodring was not a named party there is no dispute that Mr. Woodring was understood to benefit as a member of the class. Mr. Liebel's emails reflect that he was aware of Mr. Woodring's involvement in *Willis* and his continued attempts to obtain services to practice Judaism. Third, Mr. Liebel's email to Assistant Superintendent Cole (at Pendleton) could be understood to reflect that the transfer was about punishing Mr. Woodring as much as it was about providing access to the religious services he had requested. In that email, Mr. Liebel describes Mr. Woodring as "manipulative," discourages employing Mr. Woodring in the

13

law library or allowing him computer access, states that there are "no deals" to allow special visits with Mr. Woodring's terminally ill mother, and suggests that he disagrees with other decision makers at CIF regarding Mr. Woodring being allowed to make phone calls without utilizing the offender phone system. There is no indication that Mr. Liebel's views of Mr. Woodring are based on anything more than Mr. Woodring's requests for religious accommodations.

## IV. Conclusion

The motion for summary judgment [dkt. 90] is **granted in part and denied in part.**

Superintendent Knight and Jack Hendrix are voluntarily **dismissed** pursuant to Rule 41(a)(2) of the *Federal Rules of Civil Procedure*. The **clerk is directed** to terminate these individuals as defendants on the docket.

Defendants Chaplain Smith and Robert Bugher are entitled to judgment in their favor as a matter of law because there is no evidence to support a claim that they retaliated against Mr. Woodring by transferring him to Pendleton. The **clerk is directed** to terminate these individuals as defendants on the docket.

Mr. David Liebel's motion for summary judgment is **denied** because there are material facts in dispute, specifically whether a price been attached to Mr. Woodring's protected speech. *Herron,* 820 F.3d at 863. The retaliation claim against Mr. Liebel shall be resolved through settlement or trial.

This action shall be set for a settlement conference with the magistrate judge. The Court will attempt to recruit counsel to represent the plaintiff at settlement and/or at trial.

No partial final judgment shall issue at this time as to the claims resolved in this Entry.

**IT IS SO ORDERED.**

Date: <u>September 14, 2016</u>

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

BRIAN WOODRING
110925
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
NEW CASTLE, IN 47362

All Electronically Registered Counsel